## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**TIFFANY GELLY,**

    *Plaintiff,*

    v.

**ANDREW ROBERT DUNN,**
**CHEX SYSTEMS, INC.,**
**CLARITY SERVICES, INC.,**
**FACTORTRUST, INC., NISWI, LLC**
**d/b/a LENDUMO**
*and*
**SOAREN MANAGEMENT, LLC,**

    *Defendants.*

Case No.: 6:25-cv-43

**JURY TRIAL DEMANDED**

## COMPLAINT & JURY TRIAL DEMAND

COMES NOW the Plaintiff, **TIFFANY GELLY** ("Ms. Gelly"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **ANDREW ROBERT DUNN** ("Dunn"), **CHEX SYSTEMS, INC.** ("Chex"), **CLARITY SERVICES, INC.** ("Clarity"), **FACTORTRUST, INC.** ("FactorTrust"), **NISWI, LLC** *doing business as* **LendUMo** ("Niswi"), and **SOAREN MANAGEMENT, LLC** ("Soaren"), (collectively, the "Defendants"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action for damages brought by Ms. Gelly against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. § 1961, *et seq.* ("RICO") and the Florida Civil Remedies for Criminal Practices Act, § 772.101, Fla. Stat., *et seq.* ("CRCPA"), and against Niswi and Soaren only for violations of the Florida Consumer Collection Practices Act, § 559.55, Fla. Stat., *et seq.* ("FCCPA") and the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's EFTA and RICO claims arises under 15 U.S.C. § 1693m(g) and 18 U.S.C. 1965, respectively, as the EFTA and RICO are federal statutes.

3.      This Court has supplemental jurisdiction for Plaintiff's FCCPA and CRCPA state law claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat. and Fed. R. Civ. P 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because the acts complained of were committed and/or caused by the Defendants within the Middle District of Florida.

## PARTIES

### Ms. Gelly

6.      Ms. Gelly is a natural person and at all times relevant, resided in the city of Ocoee, Orange County, Florida.

7.      Ms. Gelly is a *consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

## Chex

8.      Chex is a Minnesota profit corporation with a principal business address of 347 Riverside Ave., Jacksonville, FL 32202.

9.      Chex is registered to do business in Florida as a profit corporation, where its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

## Clarity

10.     Clarity is a Delaware corporation, with a principal business address of 475 Anton Boulevard, Costa Mesa, CA 92626.

11.     Clarity is registered to conduct business as a foreign corporation in the State of Florida, where its Registered Agent is, CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

## FactorTrust

12.     FactorTrust is a Delaware limited liability company with a principal business address of P.O. Box 3653, Alpharetta, GA, 30023.

13.     FactorTrust's Delaware registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## Niswi

14.     Niswi, doing business as LendUMo, is chartered pursuant to the laws of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized sovereign Indian nation (the "LDF Tribe").

15. Niswi can be served at the LDF Tribal Office, located at 418 Old Abe Rd, Lac Du Flambeau, WI 54538.

16. Niswi issues loans to consumers online through the website www.LendUMo.com.

### Dunn

17. Dunn is a natural person, and on information and belief, the CEO of Soaren.

18. Dunn and Soaren are the true beneficial owners of LendUMo, as well as other purportedly "tribal" lenders including Makwa Finance, Target Finance, and LendUMo.

19. Dunn was also the CEO and Founder of ZenResolve, LLC, a debt collection agency which, prior to its closing in November 2023, frequently collected debt for LendUMo as, ostensibly, a "third party" debt collector.

20. Dunn resides at 10202 N 58th St., Paradise Valley, AZ 85253.

### Soaren

21. Soaren is a Delaware limited liability company, with a principal business address of 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050.

22. The Arizona registered agent for Soaren is Andrew Dunn, 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050.

## FACTUAL ALLEGATIONS

23.     In 2024, Niswi, via the website www.lendumo.com made three loans to Ms. Gelly, in which the principal amount for each loan was $900 (the "Loans"). **SEE PLAINTIFF'S EXHIBITS A, B, & C.**

24.     The annual percentage rate ("APR") on each of the Loans were between 750% annually and 795% annually. ***Id.***

25.     The proceeds of each of the Loans were wired into Ms. Gelly's checking account that she maintains in Orange County, Florida, through the Automated Clearing House ("ACH") network.

26.     Shortly after each of the Loans were issued, Ms. Gelly started making bi-weekly payments from her checking account in Florida.

27.     Ms. Gelly used the proceeds from the Loans for personal, family, or household purchases.

28.     Thus, the Loans meet the definition of *Debt* found in § 559.55(6), Fla. Stat.

29.     § 687.02(1), Fla. Stat., renders loans made at interest rates greater than 18% per year usurious.

30.     § 687.071(2), Fla. Stat., renders loans made with annual interest rates greater than 25% as criminally usurious.

31.     § 687.071(7), Fla. Stat., renders any criminally usurious loan, and logically any debt stemming from such extension of credit, void and unenforceable.

*See also* § 516.02(2)(c), Fla. Stat. (rendering debts unenforceable that originated from usurious contracts).

32.    Long-standing public policy in Florida confirms the impossibility of the alleged debt. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

33.    Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

34.    Florida law further prohibits any recovery of the principal for such usurious loans. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

35.    The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936).

36.    Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, § 516, Fla. Stat. (the "Act").

37.    The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

38.    The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

39.    § 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made*.

40.     Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

41.     Ms. Gelly's Loans each charged an *annual* interest rate vastly exceeding 25%, the rate permitted by the Act.

42.     None of the Defendants are licensed as a Consumer Finance Company in Florida.

43.     The Loans were thus unenforceable against Ms. Gelly, regardless of whether they were valid under tribal law or wherever else they may have been made.

44.     Because the annual interest rates for the Loans each vastly exceeded the 25% limit as proscribed in § 687.071(2), Fla. Stat., the Loans were void *ab initio* in Florida, pursuant to § 687.071(7), Fla. Stat.

45.     The Loans are thus *Unlawful Debts* per § 772.102(2)(a)(3), Fla. Stat. and 18 U.S.C. § 1961(6).

46.     Ms. Gelly repaid her first two loans from LendUMo in full and made as of the date of this filing is continuing to make payments on her most recent LendUMo loan.

## Niswi is a "Rent-A-Tribe" Scheme Controlled by Dunn

47.     Around April 2017, the website amplifyfunding.com was first registered.

48.     While registration information was done through Domains by Proxy, LLC in order to keep the actual registrant's information secret, on information and belief, an employee or contractor of Soaren registered the website.

49.    Around this time, Dunn and his investors and affiliates arranged for the Tribe to claim ownership of the lending enterprise and serve, on paper, as the lender of record.

50.    Niswi, LLC was then created and registered as a limited liability company under the laws of the Tribe and granted a "lending license" by the Tribe's financial services authority.

51.    Dunn and investors then provided Niswi with a revolving line of credit ("LOC") which gave Niswi access to the millions of dollars in working capital it needed to fund loans.

52.    The LOC required the Tribe to waive any sovereign immunity claims in the event of a dispute between Dunn and his investors, employ only contractors approved by Dunn and his investors, provide priority treatment in the payment of money due to Dunn and his investors, and other restrictive covenants that gave Dunn and his investors an iron grip over the "tribally" operated Amplify Funding, which was re-branded as LendUMo in 2020.

53.    The Tribe signed a master servicing agreement which required it to approve loans based on the exact specifications of Dunn and his investors.

54.    Soaren, Dunn and his related entities approved Ms. Gelly for all of her loans.

55.    Thus, an applicant for a loan from LendUMo who does not meet the qualifications established by Soaren, Dunn and his investors will not be offered a loan.

56.    This approval was then transmitted to an employee of Niswi who may have been located on the Tribe's land, who then rubber-stamped an approval, thus creating, in name only, approval "on" the Tribe's land.

57.    The only meaningful contribution the Tribe makes is that Soaren, Dunn and his investors can claim LendUMo operates under Tribal law – which, not coincidentally, was amended in the early 2010s to allow for loans to be made at 700% interest rates—and to invoke the tribe's sovereign immunity to attempt to avoid state usury laws, such as Florida's.

58.    Such agreements are generally called "rent-a-tribe" schemes.

59.    The idea that Niswi is "tribally" operated is a farce.

60.    Until mid-2020, more than three dozen "tribally owned" payday lenders, including Niswi, claimed to operate from the same second-floor office at 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. This address was actually a small retail location in rural Wisconsin selling untaxed cigarettes called the LDF Smoke Shop. The building was under 2,000 square feet.

61.    None of the Tribal employees at this office perform any significant work with respect to the operations of the payday loan websites allegedly owned and operated by the Tribe.

62.    Indeed, a promotional video made by LDF Holdings, the "parent" company of Niwsi, was uploaded to YouTube on May 21, 2017 (*see* https://www.youtube.com/watch?v=AfWbjw2ts2A). Its aim was to market its services to investors who run payday loan businesses and rent sovereign immunity

from the LDF Tribe (which LDF Holdings refers to, euphemistically, as "service providers"). The video makes clear LDF Holdings works for the service providers and is eager to earn whatever crumbs of business the service providers might be willing to outsource back to LDF Holdings.

63.    The video cements the tail-wagging-the-dog nature of LDF Holdings' sovereign immunity rental business – after all, if LDF Holdings really controlled lending enterprises like Amplify Funding (now LendUMo), it would be absurd, and unnecessary, to attempt to persuade contractors it awarded work to, to subcontract the work back to LDF Holdings.

64.    The dozens of different tribal lending entities are all primarily operated by non-tribal individuals, who merely pay the LDF Tribe a small fee to claim ownership of the various lending websites and, ostensibly, to claim the Tribe's law applies to the loans made at 750% interest.

65.    Dunn, Soaren and their related non-tribal entities and investors simply pay a small percentage of revenues – around 2% -- to the Tribe who, in exchange, publicly claim to operate the company, thus creating a veneer of sovereign immunity from criminal prosecution under Florida's usury laws.

66.    Soaren maintains offices in Scottsdale and Las Vegas where they underwrite and service their loans, perform customer service duties, and collect payments from consumers.

67.    Prior to mid-2023, when Niswi had difficulty collecting one of its loans, it assigns the loan to ZenResolve, LLC ("ZenResolve") for collection.

68.     ZenResolve was previously registered as a foreign limited liability company in Florida and listed its principal business address as 4720 E Cotton Gin Loop, Suite 135, Phoenix, AZ 85040.

69.     ZenResolve's listed Andrew Dunn as its sole managing member in its corporate filings with the state of Florida.

70.     In its initial application with the state of Florida, ZenResolve listed a principal address of 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050, which was one of Soaren's offices.

71.     In the past, Dunn and Soaren inadvertently reported tradeline data to defendant FactorTrust stating the lender was "Niswi/Amplify Funding, 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050; phone: 480-550-8178; email: info@soaren-management.com" as such:

| 12/11/2018 | 3429 | Niswi/Amplify Funding | 20830 N. Tatum Blvd, Suite 115<br>Phoenix, AZ 85050<br>480-550-8178<br>Info@soaren-management.com |
|---|---|---|---|

72.     Soaren and Dunn have several other "rent-a-tribe" schemes simultaneously active with other Indian tribes, including LittleLakeLending.com and TargetCashNow.com.

73.     Little Lake Lending claims to be operated by the Big Valley Band of Pomo Indians (the "Pomo Tribe")., while TargetCashNow.com is supposedly operated by the Fort Belknap Indian Community in Montana.

74.     In both instances, Soaren, Dunn and his investors operate all meaningful aspects of these lenders as well.

75.    A comparison of the three websites reveals a strikingly large number of similarities between them.

76.    All three lending platforms offer loans up to $2,500, and follow the same format:

- ■ The main headline of all three websites appears in the upper-lefthand corner of the homepage, with a link to the lender's Trustpilot.com page directly underneath.

- ■ The second section, aligned to the right of the page, contains a headline about flexible repayments and "no prepayment penalties" on each of the three websites.

- ■ The third section on all three websites is centered, headlined "testimonials" with the identical large-font phrase, "Our Customers Love Us," with snippets of Trustpilot reviews underneath.

- ■ The fourth section on all three websites is centered and shows the "four simple steps" to approval, all of which are variations of Step 1—apply in minutes, Step 2—verify information, Step 3—sign loan agreement, Step 4—receive your funds. The clip art used on each of the three websites is *identical*.

- ■ The fifth section on all three websites is to the left and describes the particular websites "rewards" program – U Rewards, Big Fish Rewards, and Bullseye Rewards. The three "rewards programs" also have the identical "three simple steps" – earn, redeem, repeat – and also contain *identical* clip art. All three rewards programs offer customers the ability to "redeem points for gift

Page **12** of **57**

cards to your favorite brands*" and all three feature the identical images of Wal-Mart, Home Depot, and iHop.

■ The sixth section on all three websites is placed to the left of the and explains why the particular lender is "the best," with a checklist of 6 items to the right, which contain minor variations but are essentially the same from site-to-site.

■ The seventh section on all three websites is headlined either "Quick Account Access" (Target and Little Lake) or "Easy Account Access" (LendUMo), with three boxes underneath stating "Account Login," "Apply for a Loan" and then the applicable rewards program, and once again contain *identical* clip art.

■ The eighth and final section of all three websites is placed to the left, and talks about the security of the website and data.

*See also* **PLAINTIFF'S EXHIBIT D.**

77.     The IP addresses for all three lending platforms indicate the servers are all maintained by Amazon Web Services in the same Ashburn, Virginia data center.

78.     The fact three lending websites – purportedly operated by three different Indian tribes with no relationship to each other, spread across three different states – contain such a high degree of uniformity heavily suggests they were all created by the same entity, e.g., Dunn and Soaren.

79.     Even the loan contracts and terms between the three lenders are nearly identical.

80. The interest rate on Ms. Gelly's December 3, 2024 LendUMo loan was 750%, to be repaid in 18 bi-weekly installments; her loan with Little Lake Lending taken out on September 25, 2024 was also at exactly 750% interest and to be repaid in 18 bi-weekly installments.

81. Both the LendUMo and Little Lake Lending contracts contained 10-digit alphanumeric loan numbers.

82. At some point around 2023, Dunn and the Tribe signed another agreement which "sold" Soaren to the Tribe.

83. Despite purported Tribal ownership, Soaren maintains its offices in Scottsdale and Las Vegas, at the same addresses it utilized prior to Tribal ownership.

84. On information and belief, including reviews left by former employers on hiring websites like indeed.com[1], none, or close to none, of the employees of Soaren are members of the Tribe.

85. A current employee leaving a review on indeed.com stated they worked in Las Vegas as a "loan officer." Another stated they worked in Las Vegas as a "verification specialist" at the call center, who disliked "(having) to make a certain amount of calls and close so many loans." Another employee stating they were a "loan verification agent" working in Las Vegas commented "don't work here if you aren't okay with dealing with extremely angry customers all day due to the nature of the product we are selling." An ex-employee stating they worked as a "loan verification

---

[1] As one example, a review from a remote worker in Bakersfield, CA stated "Pay is decent but sometimes it is hard to meet goals since we are selling very high internet payday loans." www.indeed.com/cmp/Soaren-1/reviews

specialist" in Las Vegas commented "loans are a hard sell due to the extremely high interest rate," to which Soaren responded "We're sorry to hear that the Loan Verification Specialist position at Soaren was not a good fit for you." A review from a remote worker in Bakersfield, CA who stated they were a Sales Agent stated "Pay is decent but sometimes it is hard to meet goals since we are selling very high internet payday loans." Of the 57 total reviews, zero reported working Tribal land or made any mention of the Tribe whatsoever. See www.indeed.com/cmp/Soaren-1/reviews?start=40, accessed December 27, 2024.

86.     Soaren's LinkedIn profile also makes zero mention of any Tribal affiliation, even stating it is "privately held" rather than "Tribally owned". https://www.linkedin.com/company/soaren-management, accessed December 27, 2024.

87.     Soaren's LinkedIn profile states it has 78 employees, most of which live in the Las Vegas and Phoenix metro areas, with four living in Mexico and three in Portland, Ore. **Id.**

88.     Even assuming, *arguendo*, that Soaren could somehow plausibly assert Tribal ownership, the fact that the majority of work it performs is for lenders claiming ownership by different, unrelated tribes would mean Soaren is not an "arm of the tribe" but more an "arm of unrelated tribes."

89.     In the past, Soaren and Dunn had a "rent-a-tribe" scheme active with the Passamaquoddy Tribe of Indian Township, in Indian Township, Maine ("Passamaquoddy Tribe").

90.     The Passamaquoddy Tribe have no relationship to the Tribe beyond both are recognized as American Indian Tribes by the United States government and both have cut "rent-a-tribe" deals with Soaren and Dunn.

91.     Yet, Soaren and Dunn apparently list the address of the *Passamaquoddy Tribe* instead of the Pomo Tribe in their credit inquiries to FactorTrust concerning Little Lake Lending, further illustrating the fact the tribes are unimportant, interchangeable parts:

> **Inquirer:** FACTOR TRUST; 675 MANSELL ROAD STE 205, ROSWELL, GA 30076
> **Phone Number:** 844.773.3321
>
> **On Behalf Of:** LAYMA LLC DBA LITTLE LAKE LENDER; 8 KENNEBASIS ROAD, INDIAN TOWNSHIP, ME 04688
> **Phone Number:** 844.600.9737
> **Inquiry Date:** 08/02/2024

### Soaren & Dunn Are the True Lender

92.     In the tribal lending ecosystem, beneficial owners of tribal lending entities like Soaren often refer to themselves as "service providers" to tribally-chartered entities like Niswi, essentially claiming the tail wags the dog.

93.     Of course, it is the dog that wags the tail, and Soaren, Dunn and their related investors provide all of the working capital to fund loans, and receive the overwhelming share of revenue.

94.     Niswi receives a series of small, but guaranteed fees, for the use of its name and status as a federally-recognized tribe, such as a fee for each loan originated, each loan which renews, each loan that remains active each month, and so forth.

95.     While the exact percentage of revenue split would vary from loan-to-loan, in most instances, Niswi would retain about 2 cents of every dollar brought in.

**Illegal Loans Took Place in Florida; Subject to Florida Law**

96.     Online payday lending, including those loans issued by Soaren via Niswi, do not actually occur on an Indian reservation, even if assuming, *arguendo*, that certain administrative aspects are addressed on the Tribe's land.

97.     A significant majority of the transaction occurred within the State of Florida. Ms. Gelly agreed to the Loan without leaving her own home. The loaned funds were to be deposited into her bank account in Florida. Collection calls, SMS messages, and emails were sent to her at her home in Florida.

98.     Where a consumer is located when he or she hits "submit" via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

99.     Ms. Gelly has never set foot on the Tribe's land.

100.    Thus, the Loan made to Ms. Gelly occurred in Florida, and is governed by the laws of the State of Florida.

**Dunn, Niswi, & Soaren Violate the EFTA By Requiring Electronic Payment**

101.    When Ms. Gelly applied for each of her three loans, she was required to provide her bank account and routing number for the purpose of allowing LendUMo to automatically debit payments electronically from her bank account.

102.    LendUMo only accepts applications online and the website will not allow an application for credit to proceed without the consumer supplying bank account and routing information.

103.    When Ms. Gelly was approved for each of the three loans, she was provided with several documents to electronically sign, including a Loan Agreement and an "EFT Authorization Agreement."

104.    The "voluntary electronic debit payment authorization" includes a provision whereby Ms. Gelly was required to consent to LendUMo initiating ACH debits from her account to make the required bi-weekly loan payments.

105.    While couched as voluntary, LendUMo will not approve a loan application which does not contain a signed, "voluntary" electronic payment agreement.

106.    Moreover, a consumer can terminate the electronic funds transfer authorization only *after* a loan has been originated.

107.    LendUMo's business model of making unsecured subprime consumer loans depends on being able to debit loan payments concurrently to when the consumer is paid, thereby being the "first in line" to receive proceeds from the consumer's paycheck.

108.    Indeed, loan applicants are required to disclose to LendUMo their pay schedule to facilitate LendUMo's capture of payments.

109.    Under Regulation E, the implementing regulation of the EFTA, "[n]o financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers...." 12 C.F.R. § 205.10(e)(1); 15 U.S.C. § 1693k(1).

110.    Thus, despite the ostensibly "voluntary" electronic payment agreement, in reality, LendUMo conditioned the loan on Ms. Gelly, like all other consumers it serves, providing consent to ACH debits or debit card payments.

111.    The fact that the agreement can be modified or altered after execution does not mean LendUMo complied with the EFTA.

112.    Violation of 15 U.S.C. § 1693k(1) occurs at the moment the lender conditions electronic funds transfers. *See De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105, 1107-09 (N.D. Cal. 2014); *Federal Trade Commission v. Payday Financial LLC*, 2013 WL 5442387, at *8-9 (D. S.D. Sept. 30, 2013).

**<u>Chex, Clarity, & FactorTrust Knowingly Facilitate Loansharking</u>**

113.    On or around November 14, 2024 Chex furnished a credit report to Clarity, on behalf of LendUMo, in connection with one of Plaintiff's loan application. **SEE PLAINTIFF'S EXHIBIT E.**

114.    Clarity also furnished a credit report to LendUMo on this date. **SEE PLAINTIFF'S EXHIBIT F.**

115.    FactorTrust also furnished a credit report to LendUMo on this date. **SEE PLAINTIFF'S EXHIBIT G.**

116.    Chex, Clarity, and FactorTrust, are specialty CRAs which primarily service the needs of online payday lenders like LendUMo – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

117.    Chex, Clarity and FactorTrust each maintain terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including consumers' checking account histories, employment and salary data, and past payday loan experiences.

118.    In most cases, when an online lender orders a credit report on a consumer, FactorTrust supplements the data in its reports with information from its parent company, TransUnion LLC ("TransUnion"), one of the "Big 3" nationwide CRAs, as well as data from other specialty CRAs, including Chex.

119.    FactorTrust merges its own data with that obtained from Trans Union and Chex into one report, which it then sells to online lenders.

120.    Likewise, Clarity also supplements this data with information from its parent company, Experian Information Solutions, Inc. ("Experian"), one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex.

121.    Clarity merges its own data with that obtained from Experian and Chex into one report, which it then sells to online lenders.

122.    Clarity and FactorTrust then merge that information within their own credit reports which is then sold to the online lender.

123.    On information and belief, Clarity, Chex, and FactorTrust's consumer reports regarding Ms. Gelly, were obtained by Soaren, or some other related non-tribal service provider, ostensibly acting on behalf of LendUMo.

124.    FactorTrust was originally an independent company prior to being acquired by TransUnion. FactorTrust was established in 2006 and, according to a deposition of Brett Taylor, FactorTrust's Vice President of Sales, its business consisted of "servicing online payday guys." *Deposition of Brett Taylor*, July 24, 2017*, FactorTrust Inc. v. Evanson Insurance Company*, Case 1:16-CV-02711-LMM, N.D. Georgia, 2016.

125.    In a 2016 interview published on Provenir.com – a web developer which provides underwriting and decisioning software to online lenders – FactorTrust's CEO, Greg Rable, boasted that, through the use of its proprietary database containing information about 200 million consumer transactions with "alternative" lenders, it was able to evaluate the credit risk and return a score to an online lender in "around a second to a second and a half." Jonathan Pryer, *113 Million US Adults Have Non-Prime Credit Scores – What Are We Doing About It?*, November 7, 2016, https://www.provenir.com/resources/blog/113-million-us-adults-have-non-prime-credit-scores.

126.    Rable went on to explain that "the three big credit bureaus historically hadn't tracked data in [online alternative lending] so we set out to help lenders more accurately predict consumer borrowing behavior in the growing, often neglected, underbanked segment." *Id.*

127.   At the time of that interview, Rable was a member of the Board of Directors of the *Online Lenders Alliance* ("OLA"), a politically active trade group which advocates for looser regulation of lenders involved in online payday lending. See, e.g., *350 Percent Interest Rate? Senators Bankrolled By Payday Lenders Can Live With That*, International Business Times, published November 17, 2017.

128.   While on the board of the OLA, Rable served alongside several of the leading proponents of what is referred to as the "rent-a-tribe" lending model, including Mark Curry, the millionaire lender behind the American Web Loan "tribal" lender. See *Solomon v. Am. Web Loan*, 4:17CV145 (E.D. Va.) (recently approved class action settlement against AWL and Curry).

129.   Another OLA board member was Kenneth Rees, the former CEO of Think Finance, which operated the purportedly "tribally-owned" LendUMo Loans under a rent-a-tribe scheme.

130.   Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its Consumers*, which it stated analyzed 350 million loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

131.   Moreover, Clarity spends what is likely hundreds of thousands of dollars each year promoting itself and its services directly to online lenders like LendUMo.

132.   For example, Clarity was a "Gold Level" sponsor of the OLA 2022 and 2023 Tribal Lending Conference; one of its employees, Paul Mitchell, a Senior

Account Executive, was also a speaker at the conference and gave insights into what kind of consumers are likely to look for, and accept the terms of, with "tribal" payday lenders.

133.  Both FactorTrust and Clarity, regularly furnish credit reports to online payday lenders who make loans at rates in excess of 600% annually, including LendUMo, Makwa Lending, TargetCashNow, Money Messiah, Tan Oak Financial, MyFlexCash.com, and NetCashMan, many of which are part of rent-a-tribe schemes.

134.  Both FactorTrust and Clarity, additionally receive tradeline data concerning loans from each of the aforementioned online lenders, as well as many others, and is thus in possession of loan information on millions of consumers.

135.  In the case of Ms. Gelly's Loans, both FactorTrust and Clarity received supplemental credit information from Chex, in which they incorporated in the credit reports they sold to LendUMo.

136.  Both FactorTrust and Clarity have extensive policies in place to conduct due diligence on potential new subscribers, as it is required to do so by the federal Fair Credit Reporting Act, which includes, in most cases, sending an investigator to the primary business office of the lender, e.g. Soaren in Arizona or Nevada.

137.  Likewise, FactorTrust has extensive policies in place to conduct due diligence on potential customers, which includes, in most cases, sending an investigator to the primary business off of the lender.

138.  For example, FactorTrust's inspector visited the offices of 777 Partners LLC and Tactical Marketing Partners, LLC ("Tactical") in Miami, Florida when

credentialling ZocaLoans.com[2], supposedly owned by the Rosebud Sioux Tribe, a rent-a-tribe scheme very similar to those engaged in by Soaren and the Tribe.

139.  Both Clarity and FactorTrust examine which states the lender operates in, along with the lender's website, which includes its interest rates, terms, and fees assessed.

140.  FactorTrust's parent company, TransUnion, has been involved in dozens of lawsuits involving its sale of credit reports and its status – unique amongst the Big 3 Nationwide CRAs – of accepting tradeline data from certain large tribal lenders like LendUMo and MobiLoans, both of which makes loans to consumers at interest rates exceeding 300% annually.  See, e.g., *Denan v. Trans Union LLC*, 959 F.3d 290 (7th Cir. 2020).

141.  As a result of the extensive litigation which delved in great detail into "rent-a-tribe" schemes and, moreover, repetitively hammered the fact that the loans were made at triple-digit interest rates, TransUnion and its wholly-owned subsidiary, FactorTrust, know of the usurious interest rates charged by these online lenders, including LendUMo.

142.  Additionally, both FactorTrust and Clarity have had numerous lawsuits filed against them concerning their provisioning of credit reports to online payday lenders with sham tribal affiliations, like LendUMo.

---

[2] ZocaLoans.com offers unsecured loans between $300 and $1500 at rates averaging 795% APR. See www.zocaloans.com/en/rate-fees/ (accessed January 20, 2022)

143. Thus, at the absolute minimum, and in a light most favorable to Clarity and FactorTrust, they knew, when furnishing a consumer credit report to LendUMo in regard to Ms. Gelly's Loans, the data that they were providing was in connection with the making of a loan at a triple-digit interest rate.

144. Even if FactorTrust and Clarity somehow believed the Tribe was the real, legitimate lender of loans made through LendUMo, FactorTrust and Clarity nonetheless knew in no uncertain terms they were providing tools and assistance to a lender making a loan at triple-digit interest rates.

145. FactorTrust and Clarity are thus aware that they are providing information to facilitate online loansharking, since they get a bird's-eye view of these lending rackets via tradeline data reported back to FactorTrust and Clarity and through their investigations of each lender.

146. FactorTrust and Clarity's data, along with the supplemental data they both received from Chex, was fed into LendUMo's automated underwriting software, which determined Ms. Gelly should be given a loan.

147. FactorTrust and Clarity's data is thus of critical importance to LendUMo's lending enterprise.

148. Absent the trove of data FactorTrust and Clarity knowingly supplied, no such loan could have been or would have been made to Ms. Gelly.

149. In addition, FactorTrust and Clarity operate as a *de facto* collection agency for LendUMo, since the presence of the LendUMo tradelines on the consumer's credit report acts as both a carrot and a stick: payment of the usurious loan

maintains the consumer's credit rating and score, but failure to pay it comes with the caveat that negative data will report, further exacerbating the plight of a consumer already under dire financial circumstances who was forced to turn to an online loan shark to make ends meet.

150.   For years, courts have recognized the power of credit reporting to procure payment. A creditor's "ability to report on the credit habits of its customers is a powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

151. Chex is a large, nationwide CRA which maintains detailed files on consumer's check writing habits, bank account openings and closings, and issues relating to checking account closures due to repeated overdrafts, fraud, or other reasons.

152. This proprietary data is of paramount interest to virtually all online payday lenders who make loans to consumers in the United States, since most online payday lenders utilize sophisticated underwriting algorithms to ascertain if a consumer is a good risk for an online payday loan.

153.   As online payday loans are, generally speaking, high-risk loans made to consumers with poor traditional credit histories, Chex data concerning checking account openings and, more importantly, closures, is of keen interest to the online payday lending industry.

154. Chex has had numerous lawsuits filed against it for the same conduct of selling reports to other CRAs on behalf of lenders who make loans at interest rates considered usurious in most states, including Florida.

155. Thus, Chex knew or should have known it was selling credit reports to FactorTrust and Clarity on behalf of non-tribal lenders making loans at illegal interest rates.

## Defendants Scheme Constitutes an Enterprise Under RICO & CRCPA

156. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

157. In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

158. Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," i.e., "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

159. Defendants are an association in fact enterprise who are associated together for the common purpose of making, collecting, and profiting off illegal loans.

160. Courts throughout the nation have held that even the provision of ordinary and legal services (i.e., the selling of credit reports) can create liability under

RICO if the actors are aware of the greater scheme afoot. *See, e.g. Smith v. Berg*, 247 F. 3d 532, 537 (3d Cir. 2001) (relying on *Salinas v. United States*, 522 U.S. 52 (1997) (holding that a court may not dismiss a RICO claim against an alleged conspirator simply because the defendant characterizes itself as having merely provided ordinary services, if there are plausible allegations that those services were provided with an awareness of the broader scheme being furthered).

161.    A plaintiff "can establish a RICO conspiracy claim by showing a [d]efendant: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts." *In re Takata Airbag Prods. Liab.*, 396 F. Supp. 3d 1101, 1164 (S.D. Fla. 2019).

162.    Chex, Clarity, and FactorTrust agreed to the overall objective of the conspiracy – to profit by providing data for underwriting analysis to the enterprise – and committed thousands of predicate acts, by selling a considerable number of reports on other consumers to LendUMo to facilitate the enterprise.

163.    The Defendants' conduct further caused Ms. Gelly to suffer from extreme emotional distress upon learning that the Loans she had entered into charged interest at more than thirty (30) times Florida's maximum rate.

164.    Ms. Gelly has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

**COUNT I**
**DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF**
**RICO, 18 U.S.C § 1962(a)**

165.    Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

166.    The Defendants, through their joint operation and control of LendUMo, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

167.    The Loans each charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loans were "unlawful debts" pursuant to 18 U.S.C. § 1961(6).

168.    The Defendants violated **18 U.S.C § 1962(a)** when they received proceeds directly or indirectly from the collection of unlawful debts – Ms. Gelly's LendUMo Loans – and utilized such proceeds to maintain the ongoing lending enterprise.

169.    The Defendants utilized the internet, telephone and mail to reach across state lines in operating the lending enterprise, including through collection calls, obtaining consumer credit reports, and ACH withdrawals and deposits to and from consumer bank accounts, including Ms. Gelly's.

170.    The Defendants' business model readily acknowledges the illegal nature of the Loans, and goes to great lengths to obfuscate how, and by whom, the Loans were made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

**COUNT II**
**DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF**
**RICO, 18 U.S.C § 1962(b)**

176.    Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

177.    The Defendants, through their joint operation and control of LendUMo, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

178.    The Loans each charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loans were "unlawful debts" pursuant to 18 U.S.C. § 1961(6).

179.    The Defendants violated **18 U.S.C § 1962(b)** when they received proceeds directly or indirectly from the collection of unlawful debts – Ms. Gelly's LendUMo Loans – and utilized such proceeds to maintain the ongoing lending enterprise.

180.    The Defendants utilized the internet, telephone and mail to reach across state lines in operating the lending enterprise, including through collection calls, obtaining consumer credit reports, and ACH withdrawals and deposits to and from consumer bank accounts, including Ms. Gelly's.

181.   The Defendants' business model readily acknowledges the illegal nature of the Loans, and goes to great lengths to obfuscate how, and by whom, the Loans were made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

182.   Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

183.   The Defendants, through their participation in the furtherance of the LendUMo scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

184.   The Loans each charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loans were *Unlawful Debts* pursuant to 18 U.S.C. § 1961(6).

185.    The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

186.    The Defendants' participation in the enterprise violated **18 U.S.C § 1962(c)** and caused Ms. Gelly to repay amounts on the unlawful Loans.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT IV
### DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF RICO, 18 U.S.C § 1962(d)

187.    Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

188.    The Defendants, through their participation in the furtherance of the LendUMo scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

189.    The Loans each charged an interest rate far more than Florida's maximum permitted rate, and thus the Loans were *Unlawful Debts* pursuant to 18 U.S.C. § 1961(6).

190.    The Defendants violated **18 U.S.C § 1962(d)** by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through LendUMo.

191.    The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loans to Ms. Gelly; (b) requested and obtained a consumer credit report regarding Ms. Gelly; (c) sold a consumer credit report regarding Ms. Gelly to assist with review of her loans application; (d) initiated ACH deposits and withdrawals to and from Ms. Gelly's bank account; and, (e) attempted collection of the Loans.

192.    The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through LendUMo.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT V
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.

171.    Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

172.    Niswi, together with Soaren, the Tribe, Clarity, Chex, and FactorTrust, and LendUMo's service providers, constitutes an "enterprise" under the CRCPA, § 772.102(3), Fla. Stat.

173.    The Loans each charged an interest rate far in excess of Florida's maximum permitted rate and constitute as *Unlawful Debt*s under § 772.102(2), Fla. Stat.

174.    Violations of § 687, Fla. Stat., amount to *Criminal Activity,* as defined in § 772.101(1)(a), Fla. Stat.

175.    The Loans made to Ms. Gelly were but one pattern of illegal loans issued to consumers by LendUMo.

176.    The Defendants each associated with each other, and the Tribe, and participated in the affairs of this enterprise, which existed for the purpose of collection of unlawful debts.

177.    The Defendants each participated in the enterprise by:

    a.    selling a consumer report regarding Ms. Gelly to assist with review and underwriting of her loan applications;

    b.    making the Loans to Ms. Gelly;

    c.    sending collection correspondence;

    d.    participating in the rent-a-tribe scheme;

    e.    making deposits into Ms. Gelly's bank account;

f.    making withdrawals from Ms. Gelly's bank account; and/or

g.    funding the Loans.

178.   The Defendants' participation in the enterprise caused Ms. Gelly to repay amounts on the unlawful Loans.

179.   The Defendants thus violated § 772.103(3), Fla. Stat.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold actual damages or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.    Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT VI
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.

180.   Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

181.   Niswi, together with Soaren, the Tribe, Clarity, Chex, and FactorTrust, and LendUMo's service providers, constitute an "enterprise" under the CRCPA, § 772.102(3), Fla. Stat.

182.    The Loans each charged an interest rate far in excess of Florida's maximum permitted rate and constitute as *Unlawful Debts* under § 772.102(2), Fla. Stat.

183.    Violations of § 687, Fla. Stat., amount to *Criminal Activity,* as defined in § 772.101(1)(a), Fla. Stat.

184.    The Loans made to Ms. Gelly were but one pattern of illegal loans issued to consumers by LendUMo.

185.    The Defendants each associated with each other, and the Tribe, and participated in the affairs of this enterprise, which existed for the purpose of collection of unlawful debts.

186.    The Defendants also each took actions in furtherance of this conspiracy by:

a.    selling a consumer report regarding Ms. Gelly to assist with review and underwriting of her loan applications;

b.    making the Loans to Ms. Gelly;

c.    sending collection correspondence;

d.    participating in the rent-a-tribe scheme;

e.    making deposits into Ms. Gelly's bank account;

f.    making withdrawals from Ms. Gelly's bank account; and/or

g.    funding the Loans.

187.    The Defendants therefore violated § 772.103(4), Fla. Stat.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold actual damages or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.    Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT VII
### NISWI & SOAREN'S JOINT & SEVERAL VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.

188.    Ms. Gelly adopts and incorporates Paragraphs 1 – 164 as if fully restated herein.

189.    Niswi and Soaren violated **§ 559.72(9), Fla. Stat.**, when they attempted to collect – and did collect – the Loans made to Ms. Gelly, asserting the legal right to collect such loans when no such right existed. The Loans were illegitimate and unenforceable due to the application of an interest rate in excess of 25% annually on the principal amount of the Loans, in violation of § 687.071 and Niswi and Soaren knew, or should have known, the Loans were unenforceable in Florida.

190.    Niswi and Soaren's actions were willful and intentional in that they were part of a strategy designed to make and collect illegal loans.

191.    Layme and Soaren's knowledge of the illegality of their loans is evident from their choice to conduct business under a "rent-a-tribe" scheme in Florida.

192.    Accordingly, Niswi and Soarn are jointly and severally liable to Ms. Gelly for her actual damages, statutory damages of up to $1,000.00, reasonable attorneys' fees, and costs.

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against Niswi and Soaren, jointly and severally, for:

a.    Statutory damages of **$1,000.00**, pursuant to § 559.77(2), Fla. Stat.;

b.    Actual damages, pursuant to § 559.77(2), Fla. Stat.;

c.    Injunctive relief preventing the Defendants from attempting to collect the Loans from Ms. Gelly, pursuant to § 559.77(2), Fla. Stat.;

d.    Reasonable costs and attorneys' fees, pursuant to § 559.77(2), Fla. Stat.; and,

e.    Such other relief that this Court deems just and proper.

### COUNT VIII
### NISWI & SOAREN'S JOINT & SEVERAL VIOLATIONS OF THE EFTA, 15 U.S.C. § 1693k(1)

193.    Ms. Gelly and incorporates Paragraphs 1 – 164 as if fully stated herein.

194.    Niswi and Soaren violated 15 U.S.C. § 1693k(1), either willfully and intentionally, or recklessly and without regard for a consumer's rights, when they conditioned the approval of multiple loans upon Ms. Gelly "voluntarily" agreeing to electronic payments.

195.   Accordingly, Niswi and Soaren are liable to Ms. Gelly for her actual damages, statutory damages of $1,000, costs, and attorney's fees pursuant to 15 U.S.C. § 1693m(a)(2)(A).

**WHEREFORE,** Ms. Gelly respectfully requests this Honorable Court enter judgment against Niswi and Soaren for:

    a.    Statutory damages of **$1,000.00** pursuant to 15 U.S.C. § 1693m(a)(2)(A);

    b.    Actual damages pursuant to 15 U.S.C. § 1693m(a)(2)(A);

    c.    Reasonable costs and attorney's fees pursuant to 15 U.S.C. § 1693m(a)(2)(A); and,

    d.    Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Gelly hereby demands a jury trial on all issues so triable.

Respectfully submitted on January 10, 2025, by:

**SERAPH LEGAL, P. A.**

*/s/ Fethullah Gulen*
Fethullah Gulen, Esq.
Florida Bar Number: 1045392
FGulen@seraphlegal.com
2124 W Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**<u>ATTACHED EXHIBIT LIST</u>**

A  Ms. Gelly's First LendUMo Loan, November 14, 2024 - Excerpt
B  Ms. Gelly's Second LendUMo Loan, November 28, 2024 - Excerpt
C  Ms. Gelly's Third LendUMo Loan, December 3, 2024 - Excerpt
D  Website Interface Comparisons between, LendUMo, Target Cash Now, and LendUMo - Excerpts
E  Ms. Gelly's Chex Consumer Disclosure, December 20, 2024, Inquiries - Excerpts
F  Ms. Gelly's Clarity Consumer Disclosure, December 20, 2024, Inquiries - Excerpts
G  Ms. Gelly's FactorTrust Consumer Disclosure, December 20, 2024, Inquiries - Excerpts